Morning, Your Honor. Tony Faramani on behalf of Mr. Espinoza. Your Honor, Mr. Espinoza has submitted affidavits from at least two witnesses who would have testified that Mr. Espinoza was not the person who shot the victim in his case. And they also say in that sworn affidavit that Cancel failed to follow up with them and interview them before trial and present their testimony to the jury. Now, we know, given that your argument, it seems to me reading the declaration from Escamilla, I don't know how to say the name exactly, it seemed like that Counsel's investigator did talk to Escamilla. Correct, Your Honor. She did communicate. And it seems to me that Counsel's investigator did talk to Rubio. Correct, Your Honor. So then Counsel did talk to these two potential witnesses with the investigator, right? I don't believe, now the declaration is not clear how far Counsel talked to them, but it is clear that they Well, what is clear is that Counsel's investigator talked to these people, but he never followed up. Correct, Your Honor. That you'll say. And I think that's it. The reason I tried to get to that is then it seems to me that Counsel knew what Escamilla and Rubio would have said through his investigator, but then probably made a strategic decision not to call them. Not necessarily, Your Honor, because number one, we know from the affidavit that the investigator at least told these witnesses that, you know, this is the important testimony, you should come and testify at trial. Well, but I know that the investigator is not the one who decides what to do. Correct, Your Honor. I'm just trying to make sure I have the facts as they are because, I mean, one thing would be nobody talked to Escamilla and no one talked to Rubio. No one then would have had any idea what they said, but when the investigator has talked to them, then at that point the record is unclear why Counsel didn't call. And generally, at that point, our precedent, and I'm only going through it because I'm trying to make a precedential decision, that it's a strategic decision of Counsel if he knows what the situation is. Well, first of all, we're assuming, respectfully, Your Honor, we're assuming that the investigator talked to the attorney. We don't know if that's true. I understand, but the biggest problem we got in this whole case is nobody's got any affidavit from Counsel one way or the other. And we've tried to obtain that affidavit. I can tell you personally, from my perspective, I can tell you what I've done, and nothing's been forthcoming. Well, the problem I guess I have is that when we have Gentry on the record, and I expect you've read Gentry. I have, Your Honor. It seems to me that in this particular case, your biggest problem, and I'm only presenting it to you because I've got to make this decision. First of all, I've got an underlying court, because this is an AEDPA decision, which says this is not a problem. I have to give deference to that court. And then I have to give deference to Counsel on a strategic decision, so that makes a double deference. And so I'm trying to make sure that I have the facts correct. Sure. Your Honor, let me just address one point that you made about Gentry case. I understand we've got a Riley case, but that's in 2003, and the Gentry case is in 2013. Correct, Your Honor, but the Gentry case was a death penalty case, and that case, the petitioner was represented by Counsel throughout. The trial counsel, in fact, submitted affidavits which outlined all the inquiries and conspicuously did not address the one inquiry regarding the expert opinion. The expert didn't address it, Your Honor. The thing that bothers me about that is you're pointing up all the big problems. Gentry seemed to be a bigger case. It was a death penalty case. Correct, Your Honor. So, therefore, it would have seemed to me that we would have leaned over more backwards for the Gentry decision than we would the Riley decision. And yet, we said, we can reject the ineffective assistance claim, and here's what I write, here's what I quote, based on Counsel's failure to offer evidence where the petitioner failed to provide declaration or affidavit from Counsel addressing the reason Counsel did not provide such evidence, which seems to go right to our decision. Not necessarily, Your Honor. I don't think it has any bearing whatsoever on this case at all. Nothing. No bearing whatsoever. And I'll tell you why. Number one, in Gentry, the people who have firsthand knowledge of the issue there, they never said anything. None of them. In fact, the expert didn't provide any declaration supporting petitioner's claim. Meanwhile, petitioner had 30 other claims, all of which were addressed by Counsel, but this one in particular, they didn't. And the assumption was that they didn't have a good case. Now, here's another difference here. Here's another difference here. In this case, Your Honor, Mr. Espinoza has done whatever he could behind bars to get that declaration. It's hard to imagine without assistance of Counsel what more he could have done. Your Honor, he's sitting there. He's asking for discovery. Counsel, let's suppose that he had gotten – I wish we had the declaration from Counsel. It would have been very useful one way or the other for helping to resolve this. But let's suppose that Counsel had not only talked to his investigator, but he went back and talked to Escamilla and to Rubio. Okay. And then knowing now what they have said, what would Counsel have done differently in this case? I think that Counsel could have presented them rather than put Mr. Espinoza on the stand. Okay. All right. So your suggestion is that the prejudice here is that Counsel would have called Escamilla and Rubio to come up and testify that Espinoza was not the only shooter. Correct, Your Honor. Knowing that Mr. Espinoza had told him that he was the only shooter, that he was prepared to go to trial and did go to trial testifying that he was the only shooter and that he shot the gun until there were no more bullets. Your Honor, Mr. Espinoza was beaten badly. We all know that. That's undisputed in the record. He was confused. He was out there. There were 40, 50 people out there. He's pretty clear in his testimony. He's pretty clear in his testimony about how he shot and that he shot until there weren't any more bullets to come out of the gun. Right. But he was also clear that he was being turned around. And he was also clear that the prosecution's theory here, Your Honor, we can't forget that. The prosecution's theory here is that Mr. Espinoza actually ran after the victim while he was crouching behind a truck and shot him. Now, there is no evidence whatsoever that would support that, none whatsoever. All we have now, the prosecution's case was strong in the sense that Mr. Espinoza was out there shooting the guard in the air, shooting on the floor. He was being surrounded by many other different people pulling on the gun. But nothing, there's no evidence tying what happened after that. There's nothing that says, yeah, we saw Mr. Espinoza running. So are you suggesting they would put them on there to show that the gun actually was wrestled from Mr. Espinoza? Or that there was a second shooter with a second gun? Second gun and revolver, for instance. Well, you don't have shell casings being expended out when you're shooting. It could have been anybody. But nobody found any other shell casings. Because in a revolver, you don't. That is Miguel Rubio's testimony, Your Honor. Now, we're not talking about a situation where there were five people and Mr. Espinoza is sitting there just shooting everybody there. We're talking about 40 to 50 people out there. We're talking about every one of these witnesses who testified for the prosecution. And by the way, Your Honor, the victim did not testify. That's a crucial fact here. The victim did not come to face Mr. Espinoza at trial and say he shot me. Now, his whole family members did, his best friend and his whole family members did. But even then, Your Honor, none of them, not even a single prosecution witness. Well, the victim thought that he had broken Espinoza's nose. Espinoza was off bleeding. Not correct, Your Honor. The brother had broken the—you're correct in the sense that Mr. Espinoza's nose was broken, in fact, and he was bleeding profusely. But the brother, Adam Rivera, the younger brother— Oh, the brother did it, yeah. Yeah, and then— But he saw it. He probably did, yes. I mean, there's nothing in the record that would establish that because there's nothing coming from him saying that I saw him bleeding. But there was—you could, I guess, infer that he did see him bleeding. But we have—you have at least two witnesses who said that they saw the shooting and that the defendant here was not the shooter. Correct, Your Honor. And defense counsel made no effort to reach those people and to talk to them. Absolutely not. And to send an investigator out to get statements from them. Nothing. Nothing. Nothing. Well, just a minute. You can't really say nothing. And we have cases on that. You do plenty of it, Your Honor. And one of them is mine. You really can't say nothing. Is that right? Because we just went through that, didn't we? One of them is my case. Yes, it is. Another case, Your Honor. And the facts are very, very similar to this. Very similar to this. Yes, Your Honor. Counsel has got a duty when they're representing a defendant. And there's no physical—is there any physical evidence in this case that shows that this defendant was the shooter? None whatsoever, Your Honor. The only thing we have—that's exactly what I was trying to communicate to the court earlier—is that we don't know what happened. Powder on his hand? Anything like that? Nothing like that. Nothing that was investigated, Your Honor. Not whatsoever. And we know that Mr. Espinoza—here's another problem with this whole thing. Why would counsel put Mr. Espinoza on the stand, subject him to cross-examination by a seasoned prosecutor, when he knew—we can assume that he knew—that there were two witnesses, at least two witnesses out there, that would have testified that he wasn't the shooter. In fact, he didn't even interview anyone. We have Sandy Braz's affidavit, uncontested. There were nine witnesses that he could have interviewed. And what is alarming about this case, Your Honor, is that even though there were 40 to 50 people out there, the only defense he presented, defense counsel here, was Mr. Espinoza. And his testimony— When Espinoza went out to leave, there was a huge crowd of people there. Correct, Your Honor. There was a kind of chaos, as I see it. That's exactly like the case that you wrote, Your Honor, the Avila case. It was pretty much the same scene. And we're talking about two people that are troublemakers that were out there. We're talking about a police officer from Mexico that was at the scene. I mean, we have a lot of things going on that this case could have changed dramatically had those witnesses been at least interviewed. I mean, I understand your concern, Your Honor. And, you know, the declaration, the lack of declaration here is one of the reasons we're asking. But the lack of declaration really goes to the question of the ineffective assistance of counsel. It goes to the first prong. I agree, Your Honor. And I'm willing to assume that for purposes of this case, and then go on to the question of prejudice. Yes, Your Honor. You know, how would it have changed this, and what obligations does a lawyer have if he thinks his client is telling the truth to put witnesses on the stand who are going to contradict his client? Johnson case. You know, there was a case that came down from this circuit. Not a too long case. I've cited it in the briefs. And that case talks about where the defendant is saying, I was not at the scene of the rape. Okay? I have alibi witnesses. My grandma and my girlfriend are my alibi. The counsel never investigates the alibis. So what he does, the defendant gets on the stand, perjures himself, and says, Look, I wasn't at the scene of the rape. I was with my grandma and my girlfriend. You know what? This court says that there was ineffective assistance for two reasons. Number one, if counsel would have interviewed the grandmother and the girlfriend, he would have learned that there was no alibi. So he would have told his client that you shouldn't go up there and testify falsely. Yeah, that's a little different from this case. He has no reason not to believe his client. His client is actually very, very specific in his testimony. And there's plenty of evidence that he had the gun and was shooting. Your Honor. I mean, there's all kinds of witnesses to that fact. There's no question that Espinoza had a gun. There's no question that Espinoza was firing shots. Your theory is there might have been a second shooter, and had counsel interviewed them, he might have brought in a different theory in addition to. Or tell Mr. Espinoza you don't need to testify because a better defense would have been that there were two. I mean, number one, we know that he had the gun. You're right about that. But we don't know if it was the lone shooter. Mr. Espinoza says I was the only guy with a gun. But how does Mr. Espinoza know? Mr. Espinoza has been beaten up about five minutes earlier. Well, he's at least the only one who possessed that gun. That's correct, Your Honor. His testimony is pretty clear on that. That's correct. And it could have been a revolver, too, where there wouldn't be any extension. And that came out through the expert testimony from the prosecution's own expert, Your Honor.  Counsel, we've taken you well over your time. I'll allow you a minute for rebuttal. Was there any, before the district court, was there any kind of a hearing on Counsel's failure in the interview? None whatsoever, Your Honor. Did this come up at all? No, Your Honor. And the reason for that is, I suspect, is because Mr. Espinoza was not represented by counsel. I was appointed by this court for appellate purposes. And then I went and done, I did my own investigation, talked to counsel, and I can represent to the court that there is some issues here. There is some question here. And I don't want to get into it because it's not part of the record, but there is question. And I wasn't able to get much answers. You know, so I think, at the very least, Your Honor, when you send someone away for the rest of their life, there should at least be some plausible reason for Counsel's failure to interview witnesses who would have exculpated my client. Okay. Thank you very much. Thank you. I will give you a minute for rebuttal. Have you ever checked on the background of defense counsel in this case? Pardon me, Your Honor? Do you know anything about the background of… I do, Your Honor. Yeah. He's a good attorney in San Diego, but he was privately retained for this case, and he just didn't do, you know… Who are you thinking about? The defense counsel, Your Honor. What's his name? Jan Ronis, Your Honor. Who? Jan Ronis. J-A-N-R-O-N-I-S is his last name. Jan Ronis. Jan Ronis, Your Honor. Ronis. Ronis. Yes, Your Honor. Okay. Let's hear from the government. Thank you. Thank you. Good morning. May it please the Court, California Deputy Attorney General Ryan Peek for the word of the Court. Did the Attorney General know there were three witnesses who said that Espinoza was not the shooter? At what time, Your Honor? At any time. So… You know, while this case was ongoing before the district court or before. So not before, no. So these affidavits came in, Your Honor, during federal habeas in the district court. And you correctly characterize what the affidavits say. And we can treat them as though they are true. And even if we do treat them as though they are true, Your Honor, I don't believe the petitioner has demonstrated either deficient performance or prejudice. Where the affidavits were before the district court at the time of the, or were they, evidentiary hearing? I don't believe that there was an evidentiary hearing, Your Honor, but yes. There was no hearing. Correct. But were these affidavits before the district court? Yes, it's my belief they were. Tell me why there's no deficient performance. As you can see with my exchange, I was willing to assume that there was deficient performance and wanted to get to prejudice. But you told me there's no deficient performance. Tell me why. I don't believe there is, Your Honor. As Justice Smith pointed out in his questioning of the petitioner, it appears from the affidavits that the witnesses or these potential witnesses actually did speak with counsel. So it looks like Sandy Barajas and Sylvia Escamilla both spoke with the attorney. Did they speak with the attorney directly? It appears so. That's my reading of the affidavits, Your Honor. It seems as if Escamilla and also Barajas or whatever her name is both spoke with the attorney, right? Correct. That's my understanding of the affidavits. The only one that didn't was Rubio. Rubio. And he spoke to the investigator. Correct, Your Honor. And, in fact, more than that, my reading of this is that Escamilla also spoke with, in addition to the attorney, the attorney's investigator. So far from failing to investigate, it appears to me, based on these affidavits, that the attorney knew what these witnesses would have said, understood it. Well, you're assuming that. Well, Your Honor, the affidavits tell us that they spoke with the attorney, and the affidavits tell us that they related to the attorney. Well, they called the attorney and wanted to testify. Yes, Your Honor. Yes, and the attorney never sent anyone out to interview them or ask them to come into the office. Correct, Your Honor. And that appears to be their complaint. Or got the information that they wanted to convey to the attorney. I mean, Judge Pregerson has to understand that there was, in fact, an investigator who talked to all and that the attorney talked to two, right? That's my understanding, Your Honor. So I agree. I don't know that there's any indication that the attorney actually sent an investigator out subsequently to go contact these people and take a formal statement. But it is my understanding from these affidavits that the information, the facts contained in the affidavits were conveyed either to the attorney or to the attorney's investigator. Now, where do you find that? Well, Judge, Sandy Barajas' declaration is at 1 ER 88. Escamilla's is at 1 ER 85. And Miguel Rubio's is at 1 ER 83. And it's my reading of the affidavits from the declarations from Escamilla and Barajas that they indicate that they both spoke with the attorney. Your Honor, there is a strong presumption that counsel did render adequate performance. No, Rubio is the one who says that he was not contacted. Correct. Okay, by either the investigator or the attorney, is that correct? I've got Escamilla's declaration in front of me. But Rubio is the one who says that he saw another male in the group who had a gun. Yes. Okay, so this is one guy who doesn't fall into the category that you've described, is not contacted, and has a slightly different theory from everybody else. This is the support for the second shooter theory. Right, so I don't believe that he's proactively contacted. My understanding is that he speaks with the investigator and then subsequently leaves voicemails for the attorney. But in any event, even – so I think we can safely say that the attorney is aware of what these people would have testified to. And aware of what they would have testified to, I think it's a strategic decision to decide not to call him. Well, how do we know that? How do we know that the attorney was aware of what these people were going to testify to? Isn't that speculation? I don't believe it's speculation because – Well, what else is it? Well, I believe I'm drawing that conclusion, Your Honor, from the declarations, from the affidavits, because these people – All right, which affidavit are you drawing there? You can't get that out of Rubio's. Well, no, I mean, I think I'm concluding that because Rubio told the investigator that the investigator would have told – Right, but there's no evidence for that, at least not with respect to Rubio. There's no evidence for that. Right? Correct. Okay, so that is a supposition on your part. Correct. We're assuming that the investigator did his job, but – Yes, Your Honor. We're here because we suspect that maybe an attorney didn't do his job, so it's possible that somebody else didn't do his job as well. Right? I mean, certainly. It's certainly possible. But I think that – So where is it in the other declaration? Is that three? Right. So Barajas, Escamilla, and Rubio. So Escamilla actually says that he talked to Juan Lopez, along with Jan Rones. Where is it in Escamilla's declaration? ER-85. It's in ER-85. Well, I've got the declaration in front of me. About three-quarters of the way down. Let me have him tell me where it is. So, Your Honor, close to the bottom, he says, I also contacted the law firm of Jan Rones and Rones and spoke with one of his investigators, Juan Lopez. What line from the bottom is that? It looks like it starts on the end of the eighth line from the bottom. And so she says that she spoke with the investigator and – Contacted the law firm of Jan Rones and spoke with one of the investigators. That's where I'm taking that from, Your Honor. And I told the investigator that Rogelio, that was having reference to the defendant, had not shot the victim and that I would testify to my testimony. However, I was never contacted again than a few times and left messages. I was never asked to appear at trial or submit my testimony in front of a judge. Nobody ever contacted her. That's what she says, isn't it? Correct. She was not contacted after that. That's a hell of a good lawyer, huh, that doesn't contact a potential witness. Huh? Your Honor, I would – You approve of that? Well, Your Honor, I would suggest to the court that understanding what this witness would have testified to – Well, you can't. You're speculating on this. You're speculating. The witness came up with a declaration. The lawyer doesn't even go over and talk to her. Well, Your Honor, even if we were to assume deficient performance, Your Honor, I don't think that petitioners demonstrated prejudice. If we assume that these people would have come to trial and would have testified consistently with their affidavits, I believe it actually would have hurt rather than helped petitioners case. Well, how do we know that? How do we know that if these people would have come in there and said they were there, they saw it, and that the defendant was not the shooter? Well, Your Honor, I say that because what they would have testified to would have been inconsistent with the physical evidence, and it would have been inconsistent with the eyewitness testimony. What's the physical evidence?  No, Your Honor. No, but there usually is if you're firing all those bullets. Well, Your Honor, in this case, the petitioner fled the scene, returned home with the firearm, and then subsequently fled to Mexico and was not apprehended until I think four years later when he returned to San Diego. So it would not have been feasible in this case to get GSR from the petitioner. Is there any ballistics evidence as to what kind of implement struck the victim in the eye? Your Honor, I don't know the answer to that. Was he hit by a bullet? Was the bullet recovered? I don't think so. What was recovered were shell casings, and so they tested. I think there were eight shell casings. Right. And the ballistics says, right, each of these. Obviously, I'm going to defense counsel's theory that there could have been a revolver involved, a second shooter, and that therefore the mayhem could have been caused by a bullet from a revolver rather than one from an automatic weapon. And the reason I don't think that's likely is because her name's Olivia Adamson, was one of the witnesses who testified, and she said that Petitioner was the only person with a gun on the scene. Oh, wait. Olivia Adams is the neighbor across the street. Yes, Your Honor. But that's a very – she's proving a negative. She's testifying to a negative. That's very difficult to do. She can only testify that that's the only one she saw with a gun. But she can't testify there are no other people with guns there, right? Your Honor, I see that my time has elapsed. Would you like me to – Yeah, go ahead. Your Honor, you're correct. Obviously, it's difficult to prove a negative. Having said that, though, I think in combination with Petitioner's trial testimony that, right, he has the only gun. He fires until he can't fire anymore. There's no one else – in other words, there's no one saying I saw a second shooter for sure that had their own gun. Even a fair reading, I think, of the affidavit says there's a struggle for the weapon, and I think Rubio says, and subsequently following this struggle, there's another – you know, another shot gets fired, which is problematic because it appears from Petitioner's testimony, which to date he hasn't recanted, that the last shot was fired before Polizia was yelled. And then after Polizia was yelled and everybody flees, there's no more shots, which, again, is inconsistent with Rubio's testimony. Okay. Thank you, Mr. Pagan. Thank you very much. What was the position of the victim at the time that he was hit in the eye? I apologize, Your Honor. I didn't catch the first part of your question. What was the position of the victim when he was hit in the eye? Your Honor, I don't know that we know that. I think the evidence was that Petitioner was chasing the victim. The victim was sort of hiding, but it's my understanding that no one actually saw. The victim was running away, wasn't he? Running and or hiding is my understanding. Well, if he was running away, how could you hit him in the eye? That's a fair point. I think he may have been cowering behind a vehicle at the time. Well, you don't know, do you? We don't know. Well, there's no eyewitness to the actual bullet that struck the victim. Well, we don't know what his position was at the time he was struck. Yeah, and if he'd been struck by a bullet, was he struck by a bullet? Well, that was the jury's finding, Your Honor. They came back and made a true finding that Petitioner personally and intentionally discharged a firearm causing great bodily harm. So that was the jury's finding, Your Honor. There are no other questions. Okay, thank you. Thank you very much. Mr. Farmani, you've got a minute. Thank you, Your Honor. Your Honor, let me just address one thing. Escamilla says that she contacted the investigator, never spoke to the attorney. So we have now two witnesses who are forthcoming with evidence that counsel never bothered to follow up on. Barajas, Sandy, is the one that said that I actually talked to the attorney, and he told me you're going to testify. In fact, in the record, it reflects that Barajas appeared in trial, but the court said you need to be excluded because you're going to be a witness. That's at the beginning of the trial. You reported transcripts all in front of the court. Another thing, counsel just said that Olivia Addison identified my client. I think something to that effect. No, she did not. In fact, the prosecutor makes that very clear in his closing argument, saying, you know, Olivia Addison said the man with the gun. And the state's theory here was that Mr. Espinoza, excuse me, Arturo Rivera, was hiding behind a truck, and there were three other people sitting around him at the time that he was shot. None of them came to testify. None of them. So I'm not sure when you talk about forensic evidence, I'm not sure if any of that ties Mr. Espinoza to the actual shooting itself, and counsel just admitted right now there is no evidence that ties him to the actual fateful shot itself, Your Honor. And the last thing I just wanted to point out, Your Honor, is that the Gentry case. I want Your Honor to just for a moment think about Mr. Espinoza sitting behind bars and doing whatever he can to get that declaration on his own. And he did whatever he could. And those documents were before the California Supreme Court, the affidavits, not just before the district court. And in addition to that, there were discovery motions that were opposed by the state, I should add. And he never got a chance. At the very least, Your Honor, either you can send this case back to the state court and have them do the job that they failed to do in the first place, or we can send it back to the district court and have an evidentiary hearing. So counsel can come forward with reasons why he would not investigate, witness his most promising defense and put Mr. Espinoza on the stand. Well, I understand your argument here. I guess I took you off with the double deference, and Judge Bybee talked to me, talked then about the prejudice. If we get to the evidentiary hearing, how am I going to get around Penn Holster? Well, number one – I mean, Penn Holster is very straight. The only thing that we can review is the state court decision and the evidence before the state court. Correct, Your Honor. This was not in front of the state court. All this stuff you've come up with thereafter. If I go to Schriero, it says the federal court is not required to hold an evidentiary hearing when the state court record precludes the relief. So we're adding evidence. So if I take Penn Holster and Schriero, I don't know what good the evidentiary hearing is going to do. Well, it would do a lot of good, Your Honor. I mean, I understand what you want it to do, but I don't understand how I can go against what those cases say, nor can the district court in accepting evidence that wasn't before the state court. Your Honor, what I want to have done is that this court make a finding on 2254D1, which would take it out of Penn Holster. If the court makes that finding, we don't have a Penn Holster trouble at all whatsoever. If the court wishes to have more evidence before it makes that determination, you could have an evidentiary hearing in the federal court, exhaust the testimony, whatever evidence you're able to get, and go back to the state court, exhaust it, and come back, if need be. Okay. If need be. I understand your argument. Thank you, Your Honor. Thank you. Thank both counsel for the argument. The case is submitted.
judges: Pregerson, Bybee, N.R. Smith